LDA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| GREGORY N. DUCKWORTH and<br>F/V REAPER, INC. | : | |
| -vs- | : | C. A. No. |
| THE UNITED STATES OF AMERICA,<br>acting by and through,<br>CARLOS M. GUTIERREZ, in his capacity<br>as SECRETARY OF COMMERCE | : | [redacted] 05 145 S |

COMPLAINT

PARTIES

1. Gregory N. Duckworth is a resident of the Town of South Kingstown, State of Rhode Island.

2. F/V Reaper, Inc. is a Rhode Island corporation, having a principal place of business located in South Kingstown, Rhode Island. At all times relevant hereto, Gregory Duckworth was the owner of the stock of F/V Reaper, Inc.

3. Carlos M. Gutierrez is the Secretary of Commerce for the United States and is named as a defendant in that capacity.

JURISDICTION

Jurisdiction for this complaint arises pursuant to the Administrative Procedures Act, 5 U.S.C. 701 et seq. and the Magnuson-Stevens Act, 16 U.S.C. §1858.

(1)

SCANNED

FACTS

4. On June 6, 2003, the National Oceanic and Atmospheric Administration ("NOAA") issued a Notice of Violation and Assessment ("NOVA") to the plaintiffs in this case. The Notice charged that on or about September 2, 2002, the plaintiff did unlawfully catch and possess approximately 1,500 pounds of monkfish without a valid permit in violation of 15 C.F.R. §§648.14(a) and (12). the penalty proposed pursuant to the NOVA was $50,000.

5. Plaintiffs by and through their attorney filed a timely request for a hearing, and the hearing was held on January 6 and January 7, 2004, before Walter Brudzinski, Administrative Law Judge.

6. Judge Brudzinski issued an Initial Decision on or about May 4, 2004, upholding the NOVA and the penalty assessed. A copy of the initial decision is attached hereto as Exhibit A.

7. Plaintiffs, pursuant to the provisions of 15 C.F.R. §904.273, filed a Request for Discretionary Review by the Administrator.

8. The Administrator denied the Request for Discretionary Review on or about March 11, 2005. A copy of the Order Denying Discretionary Review is attached hereto as Exhibit B.

9. Plaintiffs are now filing an appeal of this decision.

COUNT I

APPEAL PURSUANT TO ADMINISTRATIVE PROCEDURES ACT

10. Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 9 of this complaint.

11. The decision of the defendant is:

(a) Arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; and

(b) Not supported by substantial evidence in that:

(1) Findings of material fact are clearly erroneous based upon the evidence in the record;

(2) Necessary legal conclusions are contrary to law or precedent;

(3) Substantial and important questions of law, policy, or discretion are involved (including the amount of the civil penalties); and

(4) Prejudicial procedural errors have occurred.

WHEREFORE, the plaintiffs respectfully request that the Initial Decision and Order be reversed, that the penalties assessed be vacated, that the charges in the NOVA as filed against plaintiffs be dismissed with prejudice, and they be awarded counsel fees.

## COUNT II

## REVIEW PURSUANT TO 16 USC 1858

12. Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 11 of this complaint.

13. The defendant's decision, together with the penalties imposed, are:

(a) Arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; and

(b) Not supported by substantial evidence in that:

(1) Findings of material fact are clearly erroneous based upon the evidence in the record;

(2) Necessary legal conclusions are contrary to law or precedent;

(3) Substantial and important questions of law, policy, or discretion are involved (including the amount of the civil penalties); and

(4) Prejudicial procedural errors have occurred.

WHEREFORE, the plaintiffs respectfully request that the Initial Decision and Order be reversed, that the penalties assessed be vacated, that the charges in the NOVA as filed against plaintiffs be dismissed with prejudice, and they be awarded counsel fees.

MARK A. MCSALLY - #3006
Kelly, Kelleher, Reilly & Simpson
28 Caswell Street
Narragansett, RI 02882
(401) 789-7800
FAX: 789-6990

Dated: April 7 , 2005

UNITED STATES DEPARTMENT OF COMMERCE
NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | DOCKET NUMBER |
| | ) | |
| | ) | NE020224FM/V |
| Gregory N. Duckworth | ) | (F/V TRUE AMERICAN) |
| Reaper, Inc. | ) | |
| | ) | |
| Respondents | ) | |
| | ) | |

**INITIAL DECISION**

BEFORE: WALTER J. BRUDZINSKI, Administrative Law Judge

APPEARANCES:

FOR NOAA
Charles R. Juliand, Esquire
National Oceanic and Atmospheric Administration
Office of General Counsel NE
One Blackburn Drive
Gloucester, MA 01930

FOR RESPONDENTS
Mark A. McSally, Esquire
Kelly, Kelleher, Reilly and Simpson
Pier Professional Towers
28 Caswell Street
Narragansett, RI 02882



RECEIVED 8/4/04

**PRELIMINARY STATEMENT**

This administrative proceeding for civil penalty assessment was initiated under the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act") as amended and codified at 16 U.S.C. § 1801 *et seq.* and its underlying regulations codified at 50 C.F.R. Part 600.

On June 6, 2003, the National Oceanic and Atmospheric Administration (NOAA) issued a Notice of Violation and Assessment (NOVA) to Reaper, Inc. and Gregory N. Duckworth, the Respondents in this case. The Notice charged that on or about September 9, 2002 at or near 40-48.05N, 071-52.28W, employees, agents, or representatives of the owner of the F/V TRUE AMERICAN (Official No. 1039182), Reaper, Inc., including the Master of the F/V TRUE AMERICAN, Gregory N. Duckworth, being persons subject to the jurisdiction of the United States and named as the Respondents herein, unlawfully did catch and possess approximately 1,500 pounds of Monkfish without a valid permit, in violation of 50 C.F.R. Section 648.14(a)(12).

50 CFR 648.14(a)(12) provides, in pertinent part, that it is unlawful for any person to fish for, take, **catch**, (emphasis added) harvest or land any species of fish regulated by this part (Part 600) in or from the Exclusive Economic Zone (EEZ), unless the vessel has a valid and appropriate permit issued under this part and the permit is on board the vessel and has not been surrendered, revoked, or suspended.

50 CFR 600.10 defines "catch," along with "take" or "harvest" to include any activity that results in killing any fish or bringing any live fish on board a vessel.

50 CFR 600.10 defines "land" as to begin offloading fish, to offload fish, or to arrive in port or at a dock, berth, beach, seawall, or ramp.

50 CFR 600.10 defines Exclusive Economic Zone (EEZ) as the zone established by Presidential Proclamation 5030, 3 CFR Part 2, dated March 10, 1983, and is that area adjacent to the United States which, except where modified to accommodate international boundaries, encompasses all waters from the seaward boundary of each of the coastal states to a line on which each point is 200 nautical miles (370.40 km) from the baseline from which the territorial sea of the United States is measured.

The Agency proposed a civil penalty of $50,000. On behalf of the respondents, Mark A. McSally, Esquire filed a request for hearing on June 26, 2003. The hearing was held on January 6 and 7, 2004 in Providence, Rhode Island.

On December 24, 2004, the Agency moved for leave to amend the above charge to reflect the addition of 50 CFR 648.4(a)(9). That section provides, in pertinent part, that any vessel of the United States, including a charter or party boat, must have been issued and have on board a valid monkfish permit to fish for, **possess**, (emphasis added) or land any monkfish in or from the Exclusive Economic Zone. At the hearing, the motion was granted and the charge amended to reflect the addition of 50 CFR 648.4(a)(9).

"Possess" is not defined in 50 CFR Part 600 but it is defined in NOAA case law. In the Matter of Timothy A. Whitney, 6 O.R.W. 479 (1991) defined "possess" by reference to Black' Law Dictionary, 1979 Edition. Black's defines "possess" to mean occupy in person; to have in one's actual and physical control; to have the exclusive detention and control of; to have and hold as property; to have a just right to; to be master of; to own or be entitled to.

In support of its allegation of Magnuson-Stevens Act violation, NOAA offered the testimony of Special Agent Kevin Flanagan, National Marine Fisheries Service, NOAA; Special Agent James Cassin, National Marine Fisheries Service, NOAA; Technical Sergeant Francis Vinski, III, New York State Environmental Conservation Department, Division of Law Enforcement, Marine Enforcement Unit Coordinator; Officer Luke R. Billutto, New York State Environmental Conservation Department, Special Agent Christopher B. McCarron, National Marine Fisheries Service, NOAA; Officer Steven P. Criscione, Rhode Island Department of Environmental Management Police; Sergeant Joseph C. Poccia, Rhode Island Departmental of Environmental Management Police. NOAA also offered 21 exhibits.

Respondent Gregory N. Duckworth, the sole owner of (Respondent) Reaper, Inc. and the Master of the F/V TRUE AMERICAN, offered the testimony of his employee, Steven M. Wyley and the manager of Osprey Seafood, Christopher B. Gould. He also testified on his own behalf and offered one exhibit.

After the hearing, the parties were provided an opportunity to file post-hearing briefs and/or proposed findings of fact and conclusions of law within 30 days after receipt of the hearing transcript.

In lieu of proposed findings of fact and conclusions of law, the parties submitted post-hearing briefs. Therefore, this matter is now ripe for decision.

Based on the findings and conclusions set forth below, I find that the preponderance of the evidence supports the charge and the proposed civil penalty.

## FINDINGS OF FACT

1. That at all times relevant, Respondents, Gregory N. Duckworth and Reaper, Inc. are persons within the meaning of the Magnuson-Stevens Act and subject to the jurisdiction of the United States. (Oral stipulation of parties and Agency exhibit #5).

2. That at all times relevant, the Respondent, Gregory N. Duckworth was the sole shareholder of Respondent, Reaper, Inc. (Exhibit 8).

3. That Reaper, Inc. owned the F/V TRUE AMERICAN (Official Number 1039182). (Exhibit 8, Tr. Vol. I pp. 250-251).

4. That at all times relevant, Respondent, Gregory N. Duckworth, Reaper, Inc.'s principal owner, was the operator of the F/V TRUE AMERICAN (Official Number 1039182). (Exhibit 3, p. 6; Exhibits 8 and 9, p. 3).

5. That on September 9, 2002, Respondents Gregory N. Duckworth and Reaper, Inc., held no valid federal fishing vessel permit for Monkfish. (Exhibit 9, Tr. Vol. I, p.53).

6. That on September 9, 2002, vessels fishing in the EEZ for Monkfish were subject to federal regulations trip limits and reporting requirements. (Exhibits 3, 7; Tr. Vol. I, pp. 25,26,50; 50 CFR 648.7 and 648.94).

7. That on September 9, 2002 the F/V TRUE AMERICAN, and Respondents were observed to possess approximately 1,500 lbs of Monkfish while fishing for Skate in the Exclusive Economic Zone (EEZ) at 40-48.05N, 71-52.28W, approximately 15 miles south of Montauk, New York. (Exhibit 3, pp. 6-8; Exhibits 4, 9, 12, 15, and 20; Tr. Vol. I, pp. 138, 315).

8. That when boarded on September 9, 2002, the F/V TRUE AMERICAN had been proceeding at cruising speed; that is, there was a bow wash and no gill nets were observed in the vicinity. (Exhibits 11, 12; Tr. Vol. I pp. 107, 145-149, 168, 174).

9. That no fish or other matter was observed being discarded by the crew of the F/V TRUE AMERICAN from the time that it was first observed by enforcement personnel and none of the crewmembers was handling either fishing gear or fish. (Exhibit 9, Tr. Vol. I pp. 106-107, and 168).

10. That crewmen were seen on the F/V TRUE AMERICAN's bow and another crewman was observed to be on the vessel's stern. Respondent was at the vessel's helm. (Exhibits 9, 11; Tr. Vol. I, p. 106).

11. That a plastic fish tote on board the F/V TRUE AMERICAN contained approximately 50 pounds of live Lobster and another tote contained 100-200 pounds of Skate. (Exhibits 9, 11; Tr. Vol. I pp 156-157).

12. That Respondent Gregory N. Duckworth explained that he had no current federal permits; that he was fishing for Skates; and that the Monkfish were a by-catch to be thrown overboard. When asked why he did not discard the monkfish immediately when his nets were picked clean, Respondent Duckworth did not offer an answer. (Exhibit 9, Tr. Vol. I, p. 271).

13. That the Monkfish on board the F/V TRUE AMERICAN were contained in two pens, one starboard, one port; that they appeared to be separated by size with the

port bin containing the larger Monkfish; that the fish appeared to be dead; that the port bin contained clean Monkfish and the starboard bin contained Monkfish fish with debris; that the port bin contained Monkfish which appeared to be stacked in an alternating fashion, either belly up or the top of the fish up. (Exhibit 3, p. 7; Exhibit 9, p. 3; Exhibit 13; Tr. Vol. I, pp. 82, 105, 156, 157, 170, 184, 218, 219, and 233).

14. That Respondent Duckworth admitted to S/A Flanagan that the Monkfish on board had been caught in the EEZ earlier that day. (Exhibit 3, p. 8; Tr. Vol. I, p.53).

15. That Respondent Duckworth testified that at least some of the Monkfish had been on board the F/V TRUE AMERICAN for about an hour. (Tr. Vol. I, p. 296).

16. That law enforcement personnel directed Respondents to continue heading home, under escort, and to leave all the fish on board. (Exhibit 9, p. 4; Exhibit 11, p. 2; Exhibit 12, p. 2).

17. That law enforcement personnel, including S/A Flanagan, boarded the F/V TRUE AMERICAN when it docked at Point Judith, Rhode Island. (Exhibit 3, p. 7; Exhibit 10, p. 2; Exhibits 13 and 20).

18. Respondent Gregory N. Duckworth abandoned Respondents' interest in the entire catch of the F/V TRUE AMERICAN and the catch, including live lobster were returned to the sea. (Exhibit 3).

19. That the record shows no prior violations by Respondents. (Exhibit 5).

20. That the record contains no verifiable financial information pursuant to15 CFR 904.108(e) on Respondent's ability to pay.

## DISCUSSION OF RESPONDENT'S DEFENSES

In his testimony, Respondent Gregory N. Duckworth stated that he is the owner of three fishing vessels, the REAPER, the TRUE AMERICAN, and the TWISTER; that his procedure while gill net fishing is to take everything out of the net while hauling. For his own personal records, he tries to keep track of what he's catching and what he's discarding. (Tr. Vol. I, pp. 248-256). He stated that he doesn't throw anything overboard until all of the gear is on board and then his crew sorts through the catch. This is because the fish swim right back into the net, thereby making more work. For that reason he leaves the fish on board to document an estimated weight of what's going to be thrown overboard. (Tr. Vol. I, p. 257).

After a string or line of nets is hauled, the next process, if he was working under a Monkfish "days at sea" permit, would be to cut the fish, throw the good fish into a fish hold with ice to keep them from spoiling in warm weather and at the same time discard

the fish as they go through the pen and throw overboard what they're not allowed to keep. (Tr. Vol. I, p. 261). He does not sell Monkfish with the guts in them because they go bad. 95% of Monkfish caught are alive just prior to processing. When caught, the Monkfish were alive; a very small percentage is dead. (Tr. Vol. I, p. 265. A live Monkfish does not move. Their mouths are closed. (Tr. Vol. I, pp. 266-267).

On September 9, 2002 he did not take ice on the trip but if he were targeting Monkfish, he would have had ice on board. (Tr. Vol. I, pp. 268-269). The net flakers are located on the Starboard side of the F/V TRUE AMERICAN. Tr. Vol. I, p. 270. On September 9, 2002, he had taken in the first string or line of nets and was able to discard the Monkfish and retain the Skates. The same with the second string, but he could not discard the third and final string because he had a hydraulic leak that he had to repair, so he told the crew to take a rest while he fixed the leak. He did not want the crew to discard the Monkfish because slipping on the deck might hurt crewmen. It took approximately 15 minutes to fix the leak. (Tr. Vol. I, pp. 280-285). Fifteen minutes elapsed from hauling in the third line of nets and fixing the hydraulic leak so he did not have a chance to discard the Monkfish. (Tr. Vol. I, pp. 286, 287).

He was not expecting Monkfish because when the water warms up the Monkfish disappear; however, he did expect to catch more Skates. (Tr. Vol. I, p. 291). The Monkfish on board had been caught in the EEZ and had been onboard for about an hour when he was boarded. (Tr. Vol. I, p. 296). To document where he was, what he caught, and what he discarded, his practice is to make notes and then write down the information at night. He then transposes the information into logbooks that he keeps at his house. (Tr. Vol. I, pp. 304-309). Respondents introduced Exhibit A, which are records prepared by maintained by Gregory N. Duckworth, from August 1, 2002 to September 9, 2002.

Respondent Gregory N. Duckworth stated that a fisherman is not going to make a Monkfish trip in 90-degree weather and still be able to sell them. He estimated that he had approximately 1,500 lbs of Monkfish (the subject of this case) from his third and last string of nets and that the other two strings had approximately 2,000 pounds total. (Tr. Vol. I, p. 313-315).

On cross-examination, Respondent Gregory N. Duckworth stated that the reason the Monkfish in the port pen were clean is because the net flaker was positioned on the starboard side and that debris from the net fell into the starboard pen. (Tr. Vol. I, p. 318). When the fish are picked out of the nets, they are tossed into either the port or starboard pens so as to keep the weight evenly distributed in the boat. (Tr. Vol. I, p. 319). When asked for his logbooks by law enforcement officers, he told them that he did not have them with him. Since he was not asked about any other records or the piece of paper in his pocket that he makes notes on, he did not volunteer that information because he was not asked for it specifically. (Tr. Vol. I, pp. 329-330). His practice is to fill out the required forms only when asked to do so (by NMFS). He does not bother to comply with the reporting requirements until he needs a permit. (Tr. Vol. I, pp. 333-334). He did not show law enforcement personnel the rag he used to wipe up the spilled hydraulic fluid because he tossed it over the side. (Tr. Vol. I, p. 343).

Steven M. Wyley, an employee of Respondent, testified that on the day in question, he was operating the flaker machine on the F/V TRUE AMERICAN. The remainder of his testimony was similar to that of Respondent Gregory N. Duckworth. (Tr. Vol. II, pp. 4-34).

Christopher B. Gould, a manager at Osprey Seafood, testified that he has been purchasing Monkfish from Respondent for 6 years and has never purchased whole Monkfish without them being gutted. If the guts were in the fish, they would spoil. Further, Respondent always gets his ice from him (Mr. Gould) at Osprey Seafood and on September 9, 2002 he did not give Respondent any ice. (Tr. Vol. II, pp. 36-40).

**AGENCY'S ARGUMENTS**

The Agency argued that the F/V TRUE AMERICAN, a documented vessel of the United States while under command and control of the Respondents Gregory N. Duckworth, its captain, who was also the principal officer and owner of Reaper, Inc., both "persons" under 16 U.S.C. 1802 (31), was observed on September 9, 2002 with fish regulated by 50 CFR Part 648 on board that had been put away or segregated by species in pens and totes on deck with its crew steaming at an approximate speed of 10 knots well within the EEZ.

Monkfish is s species of fish regulated by 50 CFR Part 648. The evidence shows that Respondent caught the Monkfish in the EEZ and possessed them; that is, he exercised dominion and control over them for a substantial period of time.

The Agency cited In the Matter of Axelsson & Johnson Fish Co., Inc., 5 O.R.W. 51 (1987) at page 58. The issue in Axelsson was whether there was a violation for possessing non-conforming scallop meats; that is, possession of scallop meats exceeding an average meat count of 30 meats per pound as specified in 50 CFR 650.20. The Respondents, dock facilities, argued that there is a difference between when a dock is involved with the landing of a catch and when it is merely an observer. In landing the catch, the scallops are unloaded from the vessel to the dock, weighed, weight slips presented to the captain, a price agreed upon by the captain and the dock, and the scallops moved to a dock-selected cooler, processing area, truck, or customer. When the dock is merely an observer, it does not purchase the scallops but just has the vessel moor at its docks. The vessel discharges its catch for shipment for its own account, and the dock accommodates the vessel by making arrangements for a truck. It provides labor for the offloading and storage for the scallops in its cooler until customer pickup. The Respondents in Axelsson argued that in the first scenario, the dock had possession because it actually bought the scallops. The second scenario, they argued, more accurately fits them because it does not involve the purchase of scallops. The dock is not in possession of the scallops because it (the dock) has not weighed, sampled, or been involved with them. In other words, the difference is where the dock decides to "purchase" the catch, equating "possession" with "purchase." The judge decided that Respondents' argument was flawed because "purchase" and "possession' are not

synonymous. Whether or not a person is in possession of scallops is not dependent upon his holding title to them. The judge found that Respondents assisted in the handling of the scallops, arranging and/or aiding the offloading onto their docks, thus exercising more than sufficient dominion and control over them to constitute possession. The fact that no formal purchase was shown is not a defense. The overt acts of the Respondents are sufficient to prove possession. In support of his findings, the judge in Axelsson cited In the Matter of Chincoteague Seafood Company, 4 O.R.W. 553 (NOAA 1986) which was a similar case involving docks. In Chincoteague, the act of simply allowing undersized clams to be left on the dock was sufficient to show possession.

## RESPONDENTS' ARGUMENTS

Respondent argues that while lawfully fishing for Skate, Monkfish were caught as a by-catch and that the simple of act of catching an unauthorized species while targeting an authorized species does no constitute a violation. Since the practice authorized by law is to discard the unauthorized species and there is no specified time frame within which to complete the discard operation, a violation can only be proved if the Agency establishes that the fishing vessel intended to land and sell the unauthorized species; i.e., the Monkfish. In support of this argument, Respondent cites the following: that there was no ice on board; that he does not sell Monkfish without gutting them because they would spoil; that the Monkfish onboard the F/V TRUE AMERICAN were not gutted; that the manager of Osprey Seafood stated he had never purchased whole Monkfish from Respondent that were not gutted.

Respondent argues that the net flaker caused the debris to fall into the starboard pen because it was located on the starboard side of the vessel. Respondent argues further that there was a hydraulic leak that was discovered at the conclusion of the haul back of the third string of nets and that because hydraulic fluid was slippery and could cause a dangerous condition on the deck, Respondent told his crew to take a break and get away from the deck area so that he could fix the hydraulic leak. Respondent also argues that the content of the agents' investigation reports are suspect because of the similarity of their narratives. Finally, Respondents argue that if violations are found proved, then the $50,000 penalty assessed is too high because the Agency's penalty ranges are from $5,000 to $80,00 for first time offenses. Respondents attached the Settlement Agreement in the matter of Block Island Lobster Co., Inc. & Gary Hall in which the penalty assessed was $10,000 for unlawfully fishing for approximately 1,729 lbs of Monkfish.

## AGENCY'S REBUTTAL

In its reply brief, the Agency points out that Respondent did not tell the boarding officers about the hydraulic leak. It wasn't until much later that he related it to S/A Flanagan. Further, the Agency notes that Respondent testified that he "was only supposed to retain Skate and Crabs…" (Tr. Vol. I, p. 262) but that he also had 50-60 pounds of live Lobster at the time of boarding and that it would have taken only a few seconds to dump

the Lobsters to ensure their continued survival. The Agency also argues that the regulations prohibiting fishing for or retaining certain species are useless if fishermen are allowed to keep all by-catch on board until after they are dead. Further, whether a particular fisherman has had ample time to discard prohibited species must be determined on a case-by-case basis. The Agency cites In the Matter of Timothy A. Whitney, 6 O.R.W. 479 (1991). In Whitney, Respondent was found to both possess and to release an undersized red grouper in violation of the regulations simply by the act of spear fishing and releasing the fish while still in the water.

Further, the Agency argues that the settlement agreement submitted by Respondent in his post-hearing brief should be given no weight because it involves an unrelated matter in which a lesser penalty was assessed. In addition, the Agency argues that the civil penalty in this case must be based on evidence that is properly a part of the record and what another NOAA attorney assessed in another matter with different Respondents, different facts, difference culpability assessment, and different ability to pay is simply not relevant to the present inquiry.

## DECISION AND CONCLUSIONS OF LAW

Applying the law to the above facts, the preponderance of evidence proves that Respondents unlawfully caught and possessed approximately 1,500 pounds of Monkfish on September 9, 2002 in the EEZ without a valid permit in violation of the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1857(1)(A) and 50 CFR Sections 648.14(a)(12) and 648.4(a)(9). It is not necessary that the Agency prove Respondents intended to land and sell the Monkfish.

There is no requirement of 'intent" under 50 CFR 648(a)(12) which prescribes that it is unlawful to fish for, catch, harvest, or land, any species of fish regulated by Part 600. Likewise, there is no requirement if "intent" under 50 CFR 648.4(a)(9) which prescribes that a vessel of the United States must have been issued and have on board a valid monkfish permit to fish for, possess, or land any Monkfish in or from the EEZ. Respondent's argument that "[s]ince the practice authorized by law is to discard the unauthorized species and there is no specific time frame within which to complete the discard operation, a violation can only be proved if the Agency establishes that the fishing vessel intended to land and sell the unauthorized species" is without merit. Case law also supports the proposition that "intent" is not required to prove possession. In the Matter of Timothy A. Whitney, 6 O.R.W. 479 (NOAA 1991), (spear-fishing and releasing an undersized red grouper while still in water sufficient to find unlawful possession); In the Matter of Axelsson & Johnson Fish Co., Inc., 5 O.R.W. 51 (1987), (dock facility unlawfully possessed undersized scallops even though it did not purchase same); In the Matter of Campbell, 5 O.R.W. 328 (1988), (no intent required to find unlawful possession of illegally taken salmon).

Respondents admitted that they caught approximately 1,500 pounds of Monkfish in the EEZ. 50 CFR 600.10 defines the term "catch" along with the terms "take" or "harvest' to include any activity that results in killing any fish or bringing any live fish on

board a vessel. The Monkfish were caught, and, after catching them, brought on board Respondents' boat. Respondents continued to possess them and exercise dominion and control over them. When boarded by law enforcement, the Monkfish onboard the TRUE AMERICAN appeared dead. As noted in the Whitney case cited above, "possess" was defined by reference to Black's Law Dictionary to mean occupy in person; to have in one's actual and physical control; to have the exclusive detention and control of; to have and hold as property; to have a just right to and be master of; to own or be entitled to.

The evidence shows that Respondents had actual and exclusive physical control over the Monkfish. As in the Axelsson case where it was found that possession of non-conforming scallop meats does not require a "purchase" in order to find a possession violation under 50 CFR 650.20, "catch" and "possess" does not require an intent to land and sell in order to find violations of 50 CFR 648.14(a)(12) and 648.4(a)(9). The Monkfish were "caught" in that Respondents brought them aboard the F/V TRUE AMERICAN as live fish. Further, when discovered by law enforcement personnel, the Monkfish appeared to be dead while in pens aboard Respondents' vessel. The Monkfish were "possessed" in that Respondents had actual and physical control over them because they were not only on board the F/V TRUE AMERICAN but were also segregated from other species, placed in pens, and sorted by size. As was also shown in Whitney above, there is no minimum period of time necessary to prove unlawful possession.

Mr. Duckworth's argument that he and his crew intended to discard the Monkfish after removing them from the gillnets and placing them into pens because the fish swim back into the nets is not credible. The Monkfish were found to be contained in two pens, with large fish in one pen and smaller fish in another pen. The arrangement of the fish indicated that the crew had sorted the catch by species and the Monkfish by size. It was clear that the fish and the Lobsters were retained on the F/V TRUE AMERICAN while the vessel was fishing in the EEZ. Special Agent Flanagan testified that the incidental or by-catch of Monkfish needs to be immediately returned to the sea and that discards are usually on the work deck, in a pile, and ready to be thrown overboard, and not in pens or boxes. (Tr. Vol. I pp. 49, 50). S/A Flanagan testified further that if one is hauling the net from one side of the boat, one still has ample room to discard from the other side. (Tr. Vol. I, pp. 55-56).

Concerning how soon after taking fish on board a vessel has to discard them, Special Agent James M. Cassin testified that it all depends on the practice of the fisherman but that in his experience one does not want to handle fish more than he has to and that one should generally discard immediately. (Tr. Vol. I, p. 126). Further, Special Agent Cassin said that he has never had a fisherman tell him that gill-netters hold the discards until all the nets are onboard so the fish do not swim back into the net again. They are thrown back immediately to conserve the life of the fish. (Tr. Vol. I, p. 127). This opinion is consistent with common sense in that the regulations prohibiting fishing for or retaining certain species are of no use if fishermen are allowed to keep all of their by catch onboard until they decide when to throw them back. If that were the case, fishermen interdicted while possessing illegal catch would merely state to law enforcement officers that they intended to throw them back but just didn't get around to

it. It is similar to what Respondents are claiming in this case and that is why I am rejecting their argument. Technical Sergeant Francis Vinski, III also testified that the rules intend that unauthorized species must be discarded immediately. (Tr. Vol. I, p. 141). Special Agent Christopher McCarron testified that trash fish or something like that (discards or unauthorized fish) must be discarded immediately so as to handle it only once. (Tr. Vol. I, pp. 194, 195).

Respondents' arguments that fish disposal was delayed due to a hydraulic leak and that he did not intend to sell the fish because they were not gutted and were not on ice are unpersuasive. At the time of the boarding, the agents did not notice any evidence of slippery deck conditions or recent cleaning activity. (Exhibit 3, p. 6). When questioned during the boarding about why the Monkfish had not been discarded when his nets were picked clean, Respondent did not offer an explanation. (Id.) It was only when he was met at the dock by S/A Flanagan much later that he mentioned a problem with the hydraulic leak. (Exhibit 3, p. 7).

In response to S/A Flanagan's inquiry as to the whereabouts of his logbook, Mr. Duckworth claimed he didn't keep one, (Tr. Vol. I p. 54), yet in his testimony, he stated that he does keep personal records on what he has landed or discarded on a piece of scrap paper that he keeps on his person. Over the course of the day he records the information on the scrap paper and then at night, after he is home, he transposes the information into a logbook that he keeps at his house. (Tr. Vol. I, pp. 276, 304-307). Since he was not asked specifically about any other records or the piece of paper in his pocket, he decided that he was not going to volunteer that information. (Tr. Vol. I, pp. 329-330). When asked where his gillnets were set, Mr. Duckworth also declined to offer that information. (Tr. Vol. I, p. 57). I find that this evasive conduct and reluctance to be forthcoming further detracts from his credibility.

I also give little weight to the testimony of Steven M. Wyley and Christopher G. Gould. Mr. Wyley is an employee of Respondents. Since Respondents were charged only with catching and possessing Monkfish, Mr. Gould's testimony that he had never purchased Monkfish from Respondent that were not cut or were not on ice was not probative on the issue of catching and possessing because intent is not an element to the charge of "catch" under 50 CFR 648.14(a)(12) or "possess" under 50 CFR 648.4(a)(9).

Therefore, I find that by the preponderance of the evidence Respondent did unlawfully catch and possess approximately 1,500 pounds of monkfish without a valid permit in violation of the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1857(1)(A) and 50 CFR Sections 648.14(a)(12) and 648.4(a)(9).

**CIVIL PENALTY**

Under 15 CFR 904.108(a), factors to be considered when assessing a civil penalty may include the nature, circumstances, extent, and gravity of the alleged violation; the respondent's degree of culpability, history or prior offenses, ability to pay, and such other matters as justice may require.

15 CFR 904.108(e) also prescribes that if the respondent wants his inability to pay considered in the initial decision, verifiable financial information must be submitted to Agency counsel at least 15 days in advance of the hearing. There is no evidence that Respondent has submitted verifiable financial information 15 days in advance of the hearing.

The Block Island Lobster Co., Inc. & Gary Hall Settlement Agreement submitted by Respondents in their Post-Hearing Brief is not verifiable financial information within the meaning of 15 CFR 904.108(e). Further, that Settlement Agreement deals with an unrelated matter involving different respondents, different circumstances, and different agency counsel. Moreover, the background and factual circumstances involving that offense and respondents are unknown to the undersigned ALJ whereas the background and factual circumstances concerning these Respondents have been thoroughly developed by the parties as shown by the record. Therefore, I accord no weight to the Block Island Lobster Co., Inc. and Gary Hall Settlement Agreement.

The Magnuson-Stevens Conservation and Management Act allows for the imposition of civil penalties up to $120,000 per offense. Exhibit 21 lists the range of civil penalties for a first time offense to be $5,000 to $80,000. Respondents have no prior violations.

The record shows Respondents have caught, landed, and harvested monkfish in the past. (Exhibit 17, Respondents' Exhibit A, and Tr. Vol. I. Pp. 247-348). On September 9, 2002, Respondents were caught in the EEZ with a significant amount of Monkfish. Rather than admitting their illegal acts and responding forthrightly to specific inquiries from law enforcement personnel, Respondents chose to withhold important information regarding the location of their last gillnet set as well as Mr. Duckworth's notes from which he enters information into his logbooks. Instead, Respondents claimed that it was their intention to discard the Monkfish and keep only the Skates.

It is noted that fishermen who intend to catch and retain Monkfish in the EEZ must apply for and receive a valid federal permit. Once they have a valid Monkfish permit they are then subject to possession limits and reporting requirements. Respondents were not novices that happened to make an isolated mistake. To treat this violation as such creates an undue incentive for those wishing to set up similar scenarios to avoid the possession limits and reporting requirements. Further, possession prohibition is rendered meaningless if prohibited species are not returned to the sea as soon as practicable and fishermen are permitted to keep all by-catch aboard until and after the fish are dead. In either case, it is reasonably foreseeable that relatively small civil penalties would

jeopardize the recovery of fisheries stocks and enable unscrupulous fisherman to compete unfairly with those who are law-abiding. Therefore, the Agency's $50,000 assessed penalty reasonably reflects the gravity, nature, and circumstances of this violation.

## ORDER

IT IS THEREFORE ORDERED that Respondents Gregory N. Duckworth and Reaper, Inc. be, and hereby are, assessed a civil penalty in the amount of $50,000, jointly and severally. That is, both Respondents jointly, and each of them individually, are liable for the total assessed penalty.

Under 31 U.S.C. § 3737, failure to pay the assessed civil penalty within 30 days will generally result in interest charges and assessments to cover the cost of processing any delinquency. If the penalty, or any portion of it, becomes more than 90 days overdue, you may be assessed an additional charge of up to six percent per year.

## APPEAL

Any petition for review of this decision must be filed within 30 days of this date with the Administrator of the National Oceanic and Atmospheric Administration as provided by 15 C.F.R. § 904.273. The petition shall be addressed to the Administrator and filed at the following address: Administrator, National Oceanic and Atmospheric Administration, Department of Commence, Room 5128, 14th Street and Constitution Avenue NW, Washington, DC 20230.

Walter J. Brudzinski
U.S. Administrative Law Judge

May 25, 2004
New York, NY

# ATTACHMENT I

## LIST OF WITNESSES AND EXHIBITS

AGENCY WITNESS LIST

1. S/A Kevin Flanagan
2. S/A James Cassin
3. TSGT Francis Vinski, III
4. Officer Luke R. Billutto
5. S/A Christopher B. McCarron
6. Officer Steven P. Criscione
7. SGT Joseph C. Poccia

AGENCY EXHIBITS

1. Federal Register – 50 CFR 648.4(a)(9), 648.14(a)(12).
2. Enforcement Action Report #145153 dated 09-11-02.
3. Offense Investigation Report (OIR) of NMFS S/A Kevin Flanagan, 14 pages, signed 12-06-02 and 2 pages of field notes.
4. Chartlet showing position of F/V TRUE AMERICAN (in the EEZ) at or near 40-48.05N, 71-52.28W at approximately 14:30 hours on 09-09-02 (prepared by NMFS S/A Kevin Flanagan.
5. Commercial Vessel Operator System – Permit History of Gregory Duckworth (issued on 05-04-00 and in effect on 09-09-02).
6. Monkfish Trip Limits.
7. Small Entity Compliance Guide dated 05-17-02 Re: Monkfish Emergency Rule.
8. Documentation Re: F/V REAPER, INC. and its ownership of the F/V TRUE AMERICAN (Official #1039182).
9. Offense Investigation Report (OIR) Supplement (6 pages) of NMFS S/A James Cassin signed and dated 09-16-02.
10. Offense Investigation Report (OIR) Supplement (3 pages) of NMFS S/A Christopher McCarron signed 12-06-02 & 3 pages of field notes.
11. Offense Investigation Report (OIR) Supplement (3 pages) of New York Environmental Conservation Officer Luke Billotto signed 11-06-02.
12. Offense Investigation Report (OIR) Supplement (3 pages) of New York Environmental Conservation Officer (Sergeant) Francis Vinski, III signed 11-06-02.

13. Written Statement (1 page) of Rhode Island Department of Environmental management (RIDEM) Environmental Police Officer (EPO) Steven Criscione.
14. Photographic Proof Sheet & 12 photographs taken by RIDEM EPO Criscione.
15. Property Abandonment Form signed by Gregory Duckworth on 09-09-02 re: 1,500 pounds of monkfish and an unspecified number of American lobsters.
16. Written Statement (3 pages) of Gregory Duckworth dated 09-10-02.
17. Dealer Landing Records (30 pages from Osprey Seafood showing fish landed by, and purchased from, the F/V TRUE AMERICAN at the end of 30 fishing trips beginning 05-01-02 and ending 09-04-02.
18. Complaint Action Report regarding 05-09-02 complaints received by NMFS S/A Kevin Flanagan concerning alleged illegal fishing by the F/V TRUE AMERICAN.
19. Federal fisheries vessel permit information for the F/V TRUE AMERICAN covering the period from 08-20-01 to 04-30-03.
20. Written Statement (1 page) of RIDEM EPO Joseph Poccia dated 10-13-02.
21. Penalty Schedule page relating to fishing without a license.

RESPONDENT'S WITNESSES

1. Gregory N. Duckworth
2. Steven M. Wyley
3. Christopher B. Gould

RESPONDENT'S EXHIBITS

A. Fishing Vessel Trip Reports for the F/V TRUE AMERICAN

**CERTIFICATE OF SERVICE**

I, Shaniqua G. Jenkins, hereby certify that I have sent the foregoing **Initial Decision** to the following parties as indicated:

Charles R. Juiland, Esq.
NOAA Office of General Counsel
One Blackburn Drive
Gloucester, MA 01930
Telephone Number: (978) 281-9240
Facsimile: (978) 821-9389
via Certified Mail-Return Receipt Requested

Mark A. McSally, Esq.
Kelly, Kelleher, Reilly and Simpson
28 Caswell Street
Narragansett, RI 02882
Telephone Number: (401) 789-7800
Facsimile: (401) 789-6990
via Certified Mail-Return Receipt Requested

ALJ Docketing Center
40 South Gay Street, Room 412
Baltimore, MD 21202
Telephone Number: (410) 962-7434
Facsimile: (410) 962-1742
via Facsimile

Michele Kuruc, Esq.
Assistant General Counsel for Enforcement and Litigation
National Oceanic and Atmospheric Administration
8484 Georgia Avenue, Suite 400
Silver Spring, MD 20910
Telephone Number: (301) 427-2202
Facsimile: (301) 427-2211
via Federal Express

Shaniqua G. Jenkins
Paralegal Specialist to the
Administrative Law Judge
Telephone Number: (212) 668-2970
Facsimile: (212) 825-1230

Dated: May 25, 2004
New York, New York

**UNITED STATES OF AMERICA**
**DEPARTMENT OF COMMERCE**
**NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION**

| | |
|---|---|
| **In the Matter of Gregory N. Duckworth & Reaper, Inc.** | **Docket No. NE020223FM/V (F/V True American)** |

## ORDER DENYING DISCRETIONARY REVIEW

In a Notice of Violation and Assessment (NOVA) dated June 6, 2003, the National Oceanic and Atmospheric Administration (NOAA) charged Respondents Reaper, Inc. and Gregory Duckworth with violation of the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §1801 et seq., and implementing regulations found at 50 C.F.R. § 648.14(a)(12) and C.F.R. § 648(a)(9). The alleged violations included harvesting monkfish in federal waters without a federal permit and failing to have the required permit on board while fishing for or possessing monkfish.

After an in-person hearing, on May 25, 2004, an Administrative Law Judge (ALJ) issued an Initial Decision finding Respondents violated the Magnuson-Stevens Fishery Conservation and Management Act, as charged, and imposing a civil penalty of $50,000. On June 26, 2003, respondents filed a timely petition for review pursuant to 15 C.F.R. § 904.273, requesting discretionary review by the Administrator of the ALJ's Initial Decision.

Pursuant to 15 C.F.R. § 904.273, I decline discretionary review of the ALJ's Initial Decision. The ALJ's decision is supported by substantial evidence in the record, and no error of law occurred. Respondents have established no recognized basis for affording discretionary review under 15 C.F.R. § 904.273.

This Order Denying Discretionary Review constitutes the final administrative decision in this matter. This Order, and the civil penalty imposed by the ALJ, will become final on the date the Order is served upon Respondents.

Pursuant to 31 U.S.C. § 3717, failure to pay the assessed civil penalty within 30 days will generally result in interest charges and assessment to cover the cost of processing and delinquency. If the penalty, or any portion of it, becomes more than 90 days overdue, Respondents may be assessed an additional charge of up to six percent (6%) per year.

2/22/05
Dated

[signature]
Conrad C. Lautenbacher, Jr.
Vice Admiral, U.S. Navy (Ret.)
Under Secretary of Commerce for
Oceans and Atmosphere

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the Order Denying Discretionary Review was mailed to the following individuals on March 11, 2005.

Honorable Walter J. Brudzinski
Administrative Law Judge
United States Coast Guard
John O. Pastore Federal Building
Second Floor, Courtroom C
2 Exchange Terrace
Providence, RI 02903

Hearing Docket Clerk
United States Coast Guard
ALJ Docketing Center
Room 412
40 South Gay Street
Baltimore, MD 21202-4022

Mark A. McSally
Kelly, Kelleher, Reilly and Simpson
The Francis Building
Suite 500
146 Westminster Street
Providence, RI 02909

Charles R. Juliand
Office of General Counsel
National Oceanic and Atmospheric Administration
One Blackburn Drive
Gloucester, MA 01930

March 11, 2005
Dated

Connie J. Townsend