UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

TO: Mark McSally, Esq.

RE: CA 05-145S

Gregory Duckworth v. United States of America

ORDER

I have reviewed your document(s) presented to the Clerk's Office on 10 / 6 / 05 and have made the following determination:

_____ I hereby direct the Clerk to file the document(s) in the form in which it was presented to the Court.

✓ Your document(s) are hereby refused and returned to you for the following reason(s):

_____ 1. Pleadings, motions, other papers are not signed. (Fed. R. Civ. P. 11)

_____ 2. All motions and objections must be filed in duplicate, with accompanying memoranda filed in triplicate. (Local Rule 12 and General Order 02-01 as amended)

_____ 3. Memorandum of law must accompany all motions and objections, with the exceptions of Motions to Compel and Motions to Extend Time. (Local Rule 12)

_____ 4. New cases must be accompanied by:
a) Civil Cover Sheet (Local Rule 11)
b) Summons (Fed. R. Civ. P. 4)
c) Filing fee of $250.00 (28 U.S.C. § 1914) or $5.00 for Petitions for Habeas Corpus filed under 28 U.S.C. § 2254 and 28 U.S.C. § 2241.

_____ 5. Papers will not be accepted for filing without Certification of Service. (Local Rule 12)

_____ 6. Interrogatories and Answers or Objections thereto (Fed. R. Civ. P. 33), Initial Disclosures, Admissions, and Requests for Production, Responses and Objections (Fed. R. Civ. P. 34 & 36) shall NOT be filed with the Court. A party moving to compel (Fed. R. Civ. P. 37 (a)(2) ), shall file all pertinent portions of discovery material with the motion and copies (Local Rule 13).

_____ 7. All Checks must be made payable to **Clerk, U.S. District Court**.

_____ 8. Document violates Amended General Order 2002-01.

X 9. Other: Motions for Summary Judgment must be accompanied by a 12.1 Statement.

ENTER:

[signature]

United States Magistrate Judge

Date: 10/6/05

cc: Counsel of Record

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| GREGORY N. DUCKWORTH and F/V REAPER, INC. | : | |
| -vs- | : | C. A. No. 05-145S |
| THE UNITED STATES OF AMERICA, acting by and through, CARLOS M. GUTIERREZ, in his capacity as SECRETARY OF COMMERCE | : | |

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Now come the plaintiffs in the above-entitled matter and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby move for summary judgment. A Memorandum in support of this motion is attached hereto.

MARK A. MCSALLY - #3006
Kelly, Kelleher, Reilly & Simpson
28 Caswell Street
Narragansett, RI 02882
(401) 789-7800
FAX: (401) 789-6990

To: Kevin W. McArdle, Esquire
U. S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Benjamin Franklin Station, P. O. Box 7369
Washington, D.C. 20044-7369
(202) 305-0219
FAX: (202) 305-0275

CERTIFICATION

I hereby certify that a copy of the within was sent by electronic mail and first-class mail to the above counsel of record on October 3, 2005.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| GREGORY N. DUCKWORTH and<br>F/V REAPER, INC. | : | |
| -vs- | : | C. A. No. 05-145S |
| THE UNITED STATES OF AMERICA,<br>acting by and through,<br>CARLOS M. GUTIERREZ, in his capacity<br>as SECRETARY OF COMMERCE | : | |

MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter is before the Court upon the plaintiffs' appeal of a decision of the Secretary of Commerce imposing a civil penalty under the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act") as amended and codified in 16 U.S.C. §1801 et seq. and its underlying regulations as set forth in 50 C.F.R. Part 600.

The matter commenced in June of 2003 when the National Oceanic and Atmospheric Administration ("NOAA") issued a Notice of Violation and Assessment ("NOVA") to Reaper, Inc. and Gregory N. Duckworth. The F/V Reaper, Inc. is a Rhode Island corporation which owns the F/V True American. Gregory Duckworth is the sole shareholder of F/V Reaper, Inc. and was the captain of the F/V True American during the time period at issue in this litigation. The NOVA as issued alleged that plaintiffs violated certain Federal Regulations regulating the monkfish fishery because they unlawfully caught and possessed approximately 1,500 pounds of monkfish without a permit.

The specific Regulation alleged to have been violated was 50 C.F.R. 648.14(a)(12), which reads as follows:

> In addition to the general prohibitions specified in Section 600.725 of this Chapter, it is unlawful for any person to do any of the following:
>
> (12) fish for, take, catch, harvest or land any species of fish regulated by this part in or from the EEZ, unless the vessel has a valid and appropriate permit issued under this part and the permit is on board the vessel and has not been surrendered, revoked or suspended.

Plaintiffs filed a timely request for a hearing. Prior to commencement of the administrative hearing, NOAA moved to amend the charge to also allege a violation of 50 C.F.R. 648.4(a)(9). This section reads as follows:

> Monkfish vessels. Any vessel of the United States, including a charter or party boat must have been issued and have on board a valid monkfish permit to fish for, possess or land any monkfish in or from the EEZ.

Hearings were held before Administrative Law Judge Brudzinski on January 6, 2004, and January 7, 2004. Subsequent to the completion of the hearings, the parties filed post-hearing briefs. On or about May 25, 2004, Judge Brudzinski issued his initial decision, which upheld the violation and the assessed penalty of $50,000. The plaintiffs, in accordance with 15 C.F.R. §904.273, filed a petition for discretionary review with the Administrator of NOAA. This petition was denied on or about February 22, 2005. Thereafter, the plaintiffs filed this litigation in this Court, seeking to review the determination of Judge Brudzinski.

## II. STANDARD OF REVIEW

Decisions of NOAA imposing a civil penalty are reviewable pursuant to 16 U.S.C. §1858(b). This section provides in part that the findings of the Secretary shall be set aside by the Court if they are not supported by substantial evidence as provided for in 5 U.S.C. §706(2).

5 U.S.C. §706(2) is the general statute dealing with the review of Agency decisions. This statute provides as follows:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

In applying the "arbitrary and capricious standard," this Court's job is to review the record and determine whether the ALJ has considered all relevant and pertinent evidence and has further provided a satisfactory explanation as to the basis of his decision (see e.g. Airport Impact Release Inc. v. Wykle, 192 F.3d 197, 202 (1st Cir., 1999). It has further been said that, while the standard is differential, it is not a rubber stamp and that the reviewing court must undertake a "thorough, probing, in-depth review and a searching and careful inquiry into the record." Id. at 203.

The term "substantial evidence" for purposes of an APA appeal has been defined to mean more than a more scintilla and requires that the record contain such relative evidence that

reasonable minds would find to be adequate to support the conclusions reached by the fact finder. See, e.g., Appleyards Motor Transportation Co. Inc. v. Interstate Commerce Commission, 592 F.2d 8, 9 (1st Cir. 1979).

## III. EVIDENCE PRODUCED AT HEARING

At the hearing the Agency produced evidence through a number of different enforcement personnel that on September 9, 2002, the F/V True American was boarded in the EEZ by NOAA Special Agent Cassin and New York Department of Environmental Conservation Officer Billotto. At the time of the boarding, the F/V True American had approximately 1,500 pounds of monkfish on the deck. The monkfish was spread out between a port and starboard pen. In addition to the monkfish, there were also lobsters and skates onboard the vessel. At the time of the boarding the F/V True American held no Federal permits.

Based upon the above facts, the Agency escorted the F/V True American back to port and prohibited Duckworth from discarding the monkfish on the vessel.

The evidence produced by plaintiffs at the hearing, which is unrebutted, includes the following facts. The F/V True American was fishing in the EEZ for skate (Tr. 271). On September 9, 2002, it was lawful for a vessel without any Federal permits to fish in the EEZ for skate (Tr. 72). It was further established by the evidence that there are no specific rules or regulations regarding the time period within which species of fish that are caught by a vessel but are not eligible to be landed by that vessel must be discarded (Tr. p. 74, 202, 212). Further, there are no rules or regulations requiring that the fish being discarded be alive at the time of discard. When questioned about this issue, Special Agent Flanagan testified in part as follows:

Q. Now, is there - are you aware of a specific regulation from the National Marine Fisheries Service that sets forth the time within which a discard must occur?

A. No, I am not aware of that.

Q. O.K. Are there any guidance documents, any publications or anything from the National Marine Fisheries Service that set forth what the suggested time frame is for discards?

A. I am not aware of any, no.

Q. Is there any regulation or is there any requirement that you are aware of promulgated by the National Marine Fisheries Service that requires the discards to be returned to the sea alive?

A. I know there are some regulations that require that. For the monkfish, I do not believe so.

Q. O.K. And, in fact, if your testimony is correct that most monkfish would be dead when brought up in a gillnet, they would have to be discarded dead rather than alive. Is that a fair statement?

A. There is no other way to discard them.

Q. So there is no timing to discard and there is no requirement that they be discarded alive; is that correct?

A. Yes. (Tr. 74-75)

According to the testimony of Duckworth, the True American was fishing for skate on September 9, 2002. Prior to being boarded, it had hauled two strings of gillnet gear (Tr. 279-76). Each string of gear is approximately 4,500 feet long (Tr. 253). According to the testimony of Duckworth and Stephen Wylie, the F/V True American hauled the first string of gear, and, after that was completed, it discarded the monkfish and other species that it was not allowed to keep. It then hauled the second string of gear and proceeded to discard the monkfish and other species that it was not allowed to keep. It then hauled its third string of gillnet gear and did not commence the discard process because a hydraulic leak was discovered (Tr. 274-280).

Because of the hydraulic leak, the fishing operations on the vessel were ceased, and the crew members went on a break. Mr. Duckworth then fixed the coupling that was leaking and cleaned up the spilled hydraulic fluid. Just as he was completing the clean-up operation, the New York patrol vessel appeared next to the F/V True American (Tr. 282-86). At the time of the boarding, Duckworth told the officers that he had not completed the discard operation and that the monkfish were to be discarded (Tr. 126, 132). Despite this fact, he was not allowed to discard the monkfish.

According to the testimony of Duckworth and Wylie, the hauling of the third string of gear had been completed for approximately 15 minutes before the New York patrol vessel approached the F/V True American (Tr. 287, Vol II 13). Therefore, the monkfish that were on the deck of the F/V True American had been there for a period of between 15 minutes to one hour. Since it took approximately 45 minutes to haul the entire string of gear, it would be expected that some of the monkfish would have been on the vessel for a longer period than the monkfish that was picked out of the net at the end of the hauling operation.

None of the officers of NMFS or the State of New York have personal knowledge as to how long the monkfish had been on the F/V True American. Further, none of the Agency's witnesses have any personal knowledge as to how long of a period of time had passed between the completion of the hauling of the third string of gear and the boarding of the F/V True American (Tr. 168-69). The Agency's witnesses can only testify that they were approximately 400 yards away from the True American before they knew the identity of the vessel (Tr. 110-111). Further, they only had the vessel under observation for the period of time it took to transit the seven or eight mile gap between them (Tr. 144).

The plaintiffs also established that, when it targeted monkfish, it would take ice out on the trip to keep the fish fresh. On this particular trip, there was no ice on the vessel (Tr. 268-69). This was agreed to by all of the witnesses. Plaintiff further testified that he had never sold whole monkfish without first gutting them. The practice onboard the F/V True American was to immediately gut all monkfish once they were caught. This was because the failure to gut the fish could cause it to spoil (Tr. 261-63). These facts were confirmed by Chris Gould, the buyer of respondent's monkfish for over six years. He indicated that his company provided ice to the respondent on monkfish trips. He further testified that he never purchased a whole monkfish from respondent that had not been gutted (Tr. Vol. II, 39-40).

All of the Agency's witnesses confirmed that all the monkfish onboard the vessel had not been cut. They further confirmed the absence of ice on the vessel. This evidence is consistent with the plaintiff's testimony that he intended upon discarding the monkfish.

In an effort to establish that plaintiff was intending to keep the monkfish, the Agency attempted to rely upon testimony regarding the condition of the monkfish. Some of the Agency's witnesses testified that the monkfish in the port holding pen appeared to be clean and stacked in an orderly fashion, while the monkfish in the starboard pen were covered with debris. The reason for this was explained by plaintiff. Because the vessel has a net flaker onboard which folds the net for storage or reuse after the fished are picked out of it and the location of the net flaker will change, the debris that shakes out the net at the time of it being hauled back will be in different locations based upon the location of the flaker. In the case of the third haulback, the flaker was located in such a position that the net would be flaked over the starboard pen. Therefore, the debris from this haulback would end up in the starboard pen on the vessel (Tr. 269-70). On prior haulbacks the flaker had been in different locations, so the debris would be

located on different portions of the vessel. Based upon this testimony, the Agency cannot rely upon the condition of the fish and the amount of debris to try and establish that plaintiff intended upon keeping the monkfish.

## IV. ARGUMENT

In his decision the ALJ finds that the plaintiffs violated both 50 CFR §648.14(a)(12) and 648.4(a)(9) in that they caught and possessed monkfish without the appropriate Federal permit. (Initial decision at p. 9-10). The ALJ further rejected plaintiffs' arguments that, in order to prove violations of the above-referenced regulations, it is necessary to establish intent to retain the monkfish. In rejecting the plaintiffs' arguments, the ALJ found that the act of catching and retaining onboard for any length of time a species which is not permitted constitutes sufficient evidence to establish a violation of the Regulations (Initial decision at p. 10). This type of finding has far-reaching impacts on all fisheries and is not supported by either practice or the law.

It is plaintiffs' position that the monkfish caught while it was hauling back the third string of gillnet gear was a legal by-catch which needed to be discarded because the vessel did not have the appropriate permits to retain it. The term "by-catch" is defined in the Magnuson-Stevens Act as follows:

> (2) The term "by-catch" means fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards. Such term does not include fish released alive under a recreational catch and release fishery management program. (18 U.S.C. §1802).

The term "regulatory discards" is defined in the same section of the statute as follows:

> (33) The term "regulatory discards" means fish harvested in a fishery which fishermen are required by regulation to discard whenever caught or are required by regulation to retain but not sell.

The Magnuson-Stevens Act has further specific requirements relative to by-catch. In 16 U.S.C. §1851, the National Standards for Fishery Conservation and Management are set forth. All Fishery Management Plans are required to comply with these national standards. National Standard 9 states as follows:

> (9) Conservation and management measures shall, to the extent practicable, (A) minimize by-catch and (B) to the extent by-catch cannot be avoided, minimize the mortality of such by-catch.

16 U.S.C. §1853 contains further mandatory provisions for fishery management plans. With respect to by-catch the requirement is as follows:

> (11) establish a standardized reporting methodology to assess the amount and type of by-catch occurring in the fishery, and include conservation and management measures that, to the extent practicable and in the following priority.
>
> (A) minimize by-catch; and
>
> (B) minimize the mortality of by-catch which cannot be avoided.

From this language it is clear that the authorizing statute, the Magnuson-Stevens Act, contemplates that vessels will catch species that they are not permitted to retain while they are fishing for permitted species. The Magnuson-Stevens Act does not prohibit or penalize a vessel because it has caught by-catch. Further, based upon the treatment of by-catch in the Act and the requirements that fishery management plans attempt to minimize by-catch and the potential mortality, it is axiomatic that the Congress fully expected that vessels would catch and for some period of time possess species that were not targeted nor permitted to be retained. The Magnuson-Stevens Act does not, as the ALJ seems to indicate in its decision, penalize a vessel or vessel owner because while legally fishing it landed by-catch and was found to have that by-catch on the deck of the vessel when boarded by enforcement officials.

The reason for the above is obvious. This is because there is no technology available which would allow a vessel to haul back its nets or other devices used to catch fish and only have in them fish that it was allowed to keep. It is commonly understood by both the regulators and fishermen that by-catch is a fact of life, and the requirements of the law are to try and minimize by-catch. There is, however, no way known to the industry to eliminate it.

Since the Magnuson-Stevens Act contemplates that vessels will have by-catch, the simple act of catching an unauthorized species while targeting an authorized species cannot be the basis of a violation. To find otherwise would be to establish an impossible standard for fishermen to comply with and would further make violators out of the majority, if not all, of commercial fishermen. Rather than prohibit an act which cannot be prevented, the Magnuson-Stevens Act recognizes that the fishery management plan should take steps to minimize by-catch and the mortality that may be caused by it. It does not penalize the fact that by-catch exists and that a vessel may have as a by-catch fish on its deck that it is not permitted to retain.

In the case of monkfish there are no regulations dealing with minimization of by-catch and its potential mortality. All of the Agency's witnesses, when asked, admitted that there are no regulations setting forth a time frame within which discarding must take place. Nor are there any regulations requiring that the discards be returned to the sea alive (see testimony of Special Agent Flanagan cited earlier herein) (see also Tr. p. 141-142, 202 and 212).

Since by-catch is not illegal and there is no specified time frame within which by-catch needs to be discarded from the vessel, it should be obvious that, in order to sustain a violation for catching and possessing monkfish, there must be an intent on behalf of the plaintiffs to retain possession of the fish and either sell them or keep them for personal consumption. In the absence of such a requirement, as argued above, every vessel that catches a species it is not

authorized to catch would be in violation of the same regulations that have been relied upon by NOAA to charge the plaintiffs in this case.

Furthermore, although this is not a criminal case, plaintiffs would point the Court to cases dealing with criminal possession charges wherein an element of intent is necessary to support their argument that intent should be an element. Because the penalties in cases such as this are significant, the caselaw regarding criminal possession should be relevant for the determination as to whether a fisherman has violated the possession restrictions contained in the fishery regulations.

In United States of America v. Teemer, 349 F.3d 59, 62 (1st Cir. 2005), the First Circuit, in reviewing a conviction for possession of a firearm, reviewed and upheld jury instructions which included a requirement that possession must be both voluntary and intended. Id. at p. 62. Likewise, the Rhode Island Supreme Court has stated that "in Rhode Island possession within the context of a criminal statute means an intentional control of an object with knowledge of its nature." See State v. Kaba, 798 A.2d 383 (RI 2002).

In this case, after first having found that the arguments regarding intent were inapplicable to the regulatory scheme, the ALJ went on to reject the evidence presented by the plaintiffs as to why they were not intending to retain the monkfish. It is the plaintiffs' position that these findings by the ALJ are not supported by substantial evidence and are an abuse of discretion. Perhaps the most significant facts supporting plaintiff's claim that he was not going to retain the monkfish are that the fish had not been gutted and that there was no ice on the vessel. These facts are unrebutted. The plaintiff, his crew member, and perhaps most significantly, Christopher Gould, the agent of the establishment that purchased all of the monkfish caught by plaintiff over the years, all testified that, when the F/V True American is fishing for monkfish,

the monkfish are gutted and placed on ice in the fish hold which is below deck. This is to preserve their freshness so that they may be sold later. If they are not gutted and iced, especially on days such as the day that plaintiff was boarded, the fish will rot and be of no market value. Special Agent McCarron agreed with these statements in his testimony (Tr. p. 198). Further support comes from the fact that the Agency was unable to sell the fish once it had been brought back to port on the F/V True American. The reason it could not sell the fish is that it was unmarketable.

If in fact the plaintiffs were intending upon fishing for and retaining possession of monkfish so that they could sell it, the fish would have been gutted and placed on ice. Otherwise, the fish would be unmarketable, and there would be no reason to retain the fish and risk potential enforcement action. Since there was no ice on the vessel and none of the fish were gutted, it is difficult if not impossible to infer that the plaintiffs intended upon retaining the fish and selling them.

The ALJ also relied upon statements of the various Agency officials regarding their knowledge of the monkfish fishery and the condition of fish. Plaintiffs would by way of example point to the following testimony of Special Agent Flanagan. On cross-examination he admitted that he did not know how long a string of gillnet gear was (Tr. p. 76), had never been on a gillnet vessel to observe their operation, and has no information about how a vessel works except for a second-hand knowledge of what he has been told (Tr. p. 77). Furthermore, he had never observed the F/V True American haul in her nets (Tr. p. 78), admits that the term "slaughter pen" as used in his report to identify where the fish on the F/V True American were located was his term, and did not know whether the F/V True American had a fish hold to place and store its fish (Tr. p. 80). Finally, he admits that, despite testifying that most of the fish come

up dead in the gillnet, he has never seen a gillnet being hauled back and to support his testimony that live fish immediately discarded would not swim back into the gillnet, he points to the example of a trawl vessel which is not fishing at the time of discard and, therefore, would not recatch the fish (Tr. p. 88-90).

Further examples of the inexperience in dealing with this type of fishery can be found throughout the testimony of all of the other Agency witnesses. For example, Special Officer McCarron testified on direct examination that most fishing operations he was familiar with would discard the catch immediately so that the fish would only be handled one time (Tr. p. 193-194). On cross-examination, he indicated that he only saw gillnet vessels hauling back their gillnet on approximately two to five occasions and on each of those occasions he presumed that discarding was taking place immediately because seagulls were behind the vessel. He admits that he did not see people throwing any type of fish in the water on those occasions (Tr. p. 195-196). This is the essential type of evidence that the ALJ relied upon to discount and disregard the arguments raised by the plaintiffs. Clearly the reliance upon testimony from individuals who have little or no experience in the field they are testifying about cannot equate to substantial evidence. Further, the reliance upon unsubstantiated testimony amounts to an abuse of discretion when that testimony is used to make findings of fact that are contrary to the unrebutted testimony of the other party.

Finally, on the question of the amount of the penalty, it is plaintiffs' position that a fine of $50,000 is excessive, given the fact that there were only 1,500 pounds of monkfish involved and given the fact that the plaintiff has had no prior violations. Agency Exhibit 21 contained the penalty range for first offense. This indicated the range for the first offense such as the charges in this case was $5,000 to $80,000. Despite this range the Agency and the ALJ have elected to

fine the plaintiff at the higher end of the spectrum. Plaintiff would assert that this is unfair and inappropriate, given the way that other vessels and vessel owners were treated. As was testified to by Special Agent Flanagan, there were other individuals investigated in May of 2002 for fishing for monkfish without a permit. He testified that some of those that were cited with NOVA's were penalized in amounts significantly below the $50,000 fine assessed against plaintiff (Tr. p. 67). Special Agent Flanagan was further questioned about the case involving Block Island Lobster and Gary Hall. Since he was not familiar with that case, the facts were presented to the ALJ in the plaintiffs' post-hearing brief. As the Settlement Agreement indicated, the respondents in that case were penalized $6,000 for possessing 1,729 pounds of monkfish without a permit. These are similar charges to those faced by the plaintiff.

The ALJ rejected the argument that the Block Island Lobster case had any relevance because it involved "different respondents, different circumstances, and different Agency counsel" (Initial Decision at 12). Plaintiff believes that this is inappropriate and that consideration should be given as to how other fishermen who were similarly situated were treated by NOAA. It appears from the facts in this case that he was unfairly singled out and assessed a much higher penalty than others who were involved in similar alleged infractions. For this reason plaintiffs believe that, if the Court were to still substantiate and uphold the finding of a violation, the amount of the penalty should be reduced, based upon the circumstances of similar cases.

## V. CONCLUSION

For the foregoing reasons plaintiffs respectfully request that the decision of the ALJ be reversed.

MARK A. MCSALLY - #3006
Kelly, Kelleher, Reilly & Simpson
28 Caswell Street
Narragansett, RI 02882
(401) 789-7800
FAX: 401-789-6990

Dated: Oct 7, 2005

(joan-narr) duckworth.greg.nmfs/memo.in.support-10/3/05