UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                               )
Gregory N. Duckworth and       )
F/V Reaper, Inc.,              )
                               )
        Plaintiffs,            )
                               )
    v.                         )          C.A. No. 05-145S
                               )
United States of America,      )
acting by and through Carlos   )
M. Gutierrez, in his capacity  )
as Secretary of Commerce,      )
                               )
        Defendant.             )
_____)
```

### DECISION AND ORDER

WILLIAM E. SMITH, United States District Judge.

I.   Introduction

     Fisherman Gregory N. Duckworth and his corporation, F/V Reaper, Inc. (collectively referred to as "Duckworth"), were fined $50,000 by the National Oceanic and Atmospheric Administration ("NOAA") for unlawfully catching and possessing monkfish in federal waters without a federal permit.  Duckworth now seeks review of the imposed civil penalty pursuant to 16 U.S.C. § 1858(b).  Pending are the parties' cross-motions for summary judgment.  For the reasons that follow, Defendant's motion is granted and Duckworth's motion is denied.

II.  Background

    A.  Regulatory Regime

The Magnuson-Stevens Fishery Conservation and Management Act (the "Magnuson-Stevens Act"), as amended and codified at 16 U.S.C. § 1801 et seq., allows the Secretary of Commerce to approve, implement, and enforce fishery management plans "to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability" of American fisheries.  16 U.S.C. § 1853(a)(1)(A).  To this end, regulations may be adopted that require operators of fishing vessels to, among other things, obtain permits and limit the amount or species of fish that are harvested from the sea.  See 16 U.S.C. § 1853(b). Duckworth has been charged with violations of 50 C.F.R. §§ 648.14(a)(12) and 648.4(a)(9).  Section 648.14(a)(12) prohibits catching monkfish "in or from the [Exclusive Economic Zone ("EEZ")], unless the vessel has a valid and appropriate permit."[1] Similarly, section 648.4(a)(9) requires that any United States vessel "must have been issued and have on board a valid monkfish permit to fish for, possess, or land any monkfish in or from the EEZ."

---

[1] The EEZ is "an area of federal jurisdiction extending from 3 to 200 nautical miles seaward of the U.S. coastline." Little Bay Lobster Co., Inc. v. Evans, 352 F.3d 462, 464 (1st Cir. 2003) (citation omitted).

2

B.   <u>Facts</u>

On September 9, 2002, the crew of the F/V True American, captained by Duckworth,[2] was fishing with gillnets[3] in an area of the EEZ approximately fifteen miles south of Montauk, New York. Contemporaneously, special agent James Cassin ("Cassin") of the National Marine Fisheries Service (a subagency of the NOAA), New York State Department of Environmental Conservation officer Luke R. Billoto ("Billoto"), and other law enforcement officials were patrolling the same waters, investigating allegations that vessels illegally fishing for monkfish, including the F/V True American, were operating out of Point Judith, Rhode Island.   During their reconnaissance, the patrol boat spotted the F/V True American moving at cruising speed with Duckworth at the helm.   Agents also noticed that the F/V True American's crew members were not discarding fish or handling fish or gear.   No gillnets were visible.

Deciding to investigate further, Cassin and Billoto approached and boarded the F/V True American, where they first found two

---

[2] Duckworth is the principal owner of F/V Reaper, Inc., which owns the F/V True American.   Interestingly, it appears this is not the first time that Duckworth and F/V Reaper, Inc. have appeared in federal court concerning monkfish.   <u>See</u> <u>Hall v. Evans</u>, 2001 WL 474187 (D.R.I. April 13, 2001) (challenging certain regulations of the Monkfish Fishery Management Plan).

[3] Gillnets are strings of netting walls used to capture fish.

3

plastic fish totes – one tote contained approximately fifty pounds of live lobsters and the other contained 100-200 pounds of skate. It did not take long to notice also approximately 1,500 pounds of monkfish, apparently dead, separated into two holding bins – one with clean, larger monkfish stacked in an alternating fashion, and the other with smaller monkfish and debris.   The patrol boat thereafter escorted the F/V True American to its port in Point Judith.   Once the vessel was docked, Duckworth abandoned his interest in the monkfish and lobster (the lobster had also been obtained without a permit).

On June 6, 2003, the NOAA issued a Notice of Violation and Assessment ("NOVA"), which was later amended, charging Duckworth with unlawfully catching and possessing approximately 1,500 pounds of monkfish without a valid permit in or from the EEZ, in violation of 50 C.F.R. §§ 648.14(a)(12) and 648.4(a)(9), and assessing a $50,000 penalty.   Duckworth challenged the NOVA and received a two day hearing in front of an Administrative Law Judge ("ALJ").   On May 24, 2004, the ALJ decided Duckworth had indeed violated the Magnuson-Stevens Act and that the $50,000 penalty was appropriate. Duckworth filed a petition for review which was denied on February 22, 2005.   On April 8, 2005, Duckworth sought judicial review in

4

this Court pursuant to 16 U.S.C. § 1858(b), requesting that the
penalty assessment be set aside or reduced.[4]

III. <u>Standards of Review</u>

Pursuant to the Administrative Procedures Act, courts
reviewing final agency decisions must hold unlawful and set aside
decisions found to be "arbitrary, capricious, an abuse of
discretion, or otherwise not in accordance with law." 5 U.S.C. §
706(2)(A). An agency's findings of fact and decisions concerning
a civil penalty will be set aside if not supported by substantial
evidence in the record. <u>See</u> 16 U.S.C. § 1858(b); 5 U.S.C. §
706(2)(E). Substantial evidence means such relevant evidence as "a
reasonable mind might accept as adequate to support a conclusion."
<u>Steadman v. SEC</u>, 450 U.S. 91, 99 (1981). Under this standard,
agency determinations are presumed valid and courts must afford
great deference to the administrative decision-making process. <u>See</u>
<u>Northern Wind, Inc. v. Daley</u>, 200 F.3d 13, 17 (1st Cir. 1999).

---

[4] The timeliness of the petition has not been challenged.
<u>See</u> 16 U.S.C. § 1858(b) (requiring complaint be filed within 30
days from the date of order denying discretionary review). Even
so, the Court notes that the order denying the petition for
discretionary review was not mailed to the parties until March 11,
2005. Thus, Duckworth's complaint, filed on April 8, 2005, is
timely. <u>See</u>, e.g., <u>Fishing Co. of Alaska v. United States</u>, 195 F.
Supp. 2d 1239, 1247 (W.D. Wash. 2002) (finding jurisdiction where
Secretary mailed the denial of discretionary review to the parties
on December 27, 1996 and the plaintiffs filed their complaint on
January 27, 1997).

Moreover, the ALJ has considerable discretion to draw inferences and make credibility determinations, and courts "may not disturb [the ALJ's] judgment and the [agency's] endorsement of it so long as the findings are adequately anchored in the record." <u>Bath Iron Works Corp. v. United States Dep't of Labor</u>, 336 F.3d 51, 56 (1st Cir. 2003). While questions of law require greater scrutiny, courts must give "substantial deference to an agency's interpretation of its own regulations." <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994).

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Cross-motions for summary judgment "do not alter the basic Rule 56 standard, but rather simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." <u>Adria Int'l Group, Inc. v. Ferre Dev., Inc.</u>, 241 F.3d 103, 107 (1st Cir. 2001) (citation omitted).

IV.  <u>Analysis</u>

Duckworth concedes that the monkfish in his possession were seized from the EEZ, and further, that he did not have a federal permit to catch or possess monkfish. Nonetheless, Duckworth

advances two claims of error:    (1) he did not violate the regulations because he did not intend to keep the monkfish; and (2) the assessed penalty is excessive.

A.    The Regulatory Violations

Duckworth first contends that to prove a violation of §§ 648.14(a)(12) and 648.4(a)(9), the Government must prove not merely that he caught and possessed monkfish, but also that he intended to retain them.   This makes sense here, Duckworth argues, because he was only fishing for skate and the monkfish found on board were simply "bycatch," i.e. fish inadvertently swept up in the gillnets. See 16 U.S.C. § 1802(2) and (33) (explaining that bycatch is the incidental harvest of fish discarded for economic or regulatory reasons).   A species would be considered bycatch, for example, if a fisherman were lawfully harvesting crabs, but accidentally scooped up regulated abalone without a permit.   The fisherman would then be required to return the abalone back to the sea as soon as possible.   The parties agree that the Magnuson-Stevens Act contemplates the inevitability of bycatch and instructs that "[c]onservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch."   16 U.S.C. § 1851(a)(9).

7

Duckworth's bycatch argument is buoyed by his version of events.   According to Duckworth, prior to the patrol boat's arrival, he and his crew had hauled in two strings of gillnet gear[5] and had discarded all monkfish, along with any other catch the crew was not authorized to keep.   When the crew hauled in the third string, however, a hydraulic leak interfered with the crew's discard of the last batch of monkfish.   Just as Duckworth was completing the leak repair and preparing to order the monkfish be discarded, so the story goes, law enforcement officials made their appearance.[6]   This fish-tale is not without some support in the record.   For example, Duckworth and Chris Gould (who purchased monkfish from Duckworth for over six years) testified that Duckworth's monkfishing expeditions always involved gutting the fish immediately after they were caught and placing them on ice to prevent spoliation.   And indeed, on September 9, 2002, the F/V True American sailed without ice and the monkfish seized had not been gutted.

The ALJ, however, found Duckworth's story less than credible; a decision with which Duckworth now takes issue.   Mindful of the deference given to an ALJ's credibility determinations, see, e.g.,

---

[5]   Each string of gear is approximately 4,500 feet long.

[6]   Duckworth estimates that the patrol boat arrived approximately fifteen minutes after the crew had finished hauling the third string of gear.

8

<u>Frustaglia v. Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 194 n.1
(1st Cir. 1987), the Court finds the record contains substantial
evidence to support the ALJ's rejection of Duckworth's testimony.
For one, Duckworth's tale grows taller when one considers the fact
that the monkfish had been separated into two pens, with one pen
containing the larger monkfish, cleaned and stacked.   (The fact
that the unlawfully obtained lobsters had been similarly segregated
adds another layer of suspicion.)   Second, when the agents first
observed the F/V True American, the vessel was moving at cruising
speed and the crew was not discarding fish or handling any gear.
This  evidence  tends  to  show  that  Duckworth  and  crew  had  no
intention  of  discarding  the  monkfish,  and  instead  were  simply
motoring back to port as quickly as possible with their unlawful
catch.    Third,  Duckworth's  conduct  when  confronted  by  agents,
including his guarded and evasive answers to agents' questions (and
at times, outright refusal to give answers), is simply inconsistent
with  the  expected  conduct  of  an  innocent  fisherman  who  had  just
been  fixing  a  leak  and  was  on  the  verge  of  discarding  bycatch.
Finally,  there  are  several  holes  in  the  hydraulic  leak  story,
including Duckworth's failure to mention the leak when asked by
special  agent  Cassin  why  the  monkfish  had  not  been  discarded,
special  agent  Flanagan's  testimony  that  he  examined  the  area
surrounding the supposed leak and found it dry and free of residue,

9

and Duckworth's inability to show the agents the rag supposedly used to clean up the leak.

Furthermore, the ALJ properly rejected the argument that the Government was required to prove Duckworth's intent to retain the monkfish. As the ALJ observed, neither charged regulation contains a scienter requirement, and NOAA opinions consistently explain that intent is not required to prove possession. See In the Matter of Timothy A. Whitney, 6 O.R.W. 479 (NOAA 1991); In the Matter of Axelsson & Johnson Fish Co., Inc., 5 O.R.W. 51 (NOAA 1987); In the Matter of Carl Campbell, 5 O.R.W. 328 (NOAA 1988). The ALJ's reasoning is well-packaged and sealed by the First Circuit's discussion of the strict liability nature of regulatory offenses:

> As a general matter, scienter is not required to impose civil penalties for regulatory violations when the regulation is silent as to state of mind. Further, a mens rea element is never presumed for regulatory offenses. Moreover, scienter never has been required for violations of public welfare regulations because they are not in the nature of positive aggressions or invasions, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Finally, scienter is not an element of a civil defense under the Magnuson Act. Because conservation-related offenses under the Magnuson Act are strict liability offenses, Northern Wind's protests as to its state of mind are irrelevant.

Northern Wind, Inc., 200 F.3d at 19 (internal citations and quotation marks omitted). Accordingly, the ALJ did not err in finding that Duckworth was strictly liable under the Magnuson-

Stevens Act without proof that he intended to retain the monkfish. Cf. <u>Roche v. Evans</u>, 249 F. Supp. 2d 47, 57 (D. Mass. 2003) (holding fisherman strictly liable for entering into a closed area).

One of Duckworth's overriding concerns (and one likely shared by many members of the fishing community) is that the strict liability nature of the Magnuson-Stevens Act converts fishermen who have innocently caught a regulated species without a permit into violators. It should be emphasized that an important benefit of strict enforcement, especially in a difficult to regulate industry such as fishing, is to provide a "'bright line' standard that can easily and efficiently be applied to advance the goals of the regulations." <u>Roche</u>, 249 F. Supp. 2d at 59. Concerning bycatch, a strict liability framework strongly encourages fishermen to return non-permitted species to the sea as soon as safely possible in order to minimize the mortality to the fish.

Fishermen should find some solace in this strict regime, however, because there is a practical side to enforcement that sharpens a seemingly blunt regulatory tool. As an everyday matter, although the regulations do not contain a scienter element, it cannot be said that every fishermen found with a regulated species of fish will always be fined. Instead, the burden is effectively placed onto the fisherman to provide a reasonable explanation to the investigating agents why certain fish found on a vessel are

indeed bycatch. This practical side of enforcement is highlighted by the record in this case. When agents first boarded the F/V True American, they gave Duckworth ample opportunity to explain himself. But ultimately, Duckworth's evasive conduct and unconvincing explanations did little to suggest his lack of culpability, and indeed increased it.

B.   The Penalty

Each violation of the Magnuson-Stevens Act may incur a maximum civil penalty of $100,000, see 16 U.S.C. § 1858(a), with an inflation-adjusted maximum of $120,000 per offense. See 65 Fed. Reg. 65,260, 65,262 (Nov. 1, 2000). NOAA's guidelines provide that the appropriate penalty range for first-time offenders is $5,000 - $80,000. In assessing a civil penalty, several factors must be considered, including "the nature, circumstances, extent, and gravity of the prohibited acts committed and, with respect to the violator, the degree of culpability, any history of prior offenses, and such other matters as justice may require." 16 U.S.C. § 1858(a); see also 15 C.F.R. § 904.108(a).[7]

---

[7]  In assessing the penalty, "the Secretary may also consider any information provided by the violator relating to the ability of the violator to pay." See 16 U.S.C. § 1858(a). Duckworth chose not to submit information below relating to his ability to pay.

Here, the ALJ found that the $50,000 assessment reasonably reflected the gravity, nature, and circumstances of the violation. In support, the ALJ emphasized Duckworth's experience as a fisherman, his ineffective attempts to wiggle out of being caught red-handed, the deterrent effect of this penalty on other fishermen tempted by the desire to gain an unfair advantage over permitted fishermen (who are restricted by catch limitations and reporting requirements), as well as the environmental message that fishermen should act so as to avoid carelessly or improperly depleting fishery stocks. The ALJ's analysis clearly demonstrates that he "considered relevant facts and articulated some reasonable relationship between those facts and the penalty." Fishing Co. of Alaska, 195 F. Supp. 2d at 1254-56 (finding no error in the penalty assessed).

Duckworth argued to the ALJ, and reasserts here, that the $50,000 fine is excessive in light of a case involving Block Island Lobster and Gary Hall, who were penalized $6,000 pursuant to a settlement agreement for illegally possessing 1,729 pounds of monkfish.[8] The ALJ afforded no weight to the Block Island Lobster

---

[8] It is not surprising that Duckworth and F/V Reaper, Inc. seem especially familiar with the situation of Block Island Lobster and Gary Hall, considering they were all plaintiffs in Duckworth's and F/V Reaper, Inc.'s previous federal monkfish case. See Hall v. Evans, 2001 WL 474187.

13

case because it involved different individuals and circumstances that were largely unknown to the ALJ. (As opposed, of course, to Duckworth's case which had been thoroughly developed at the administrative level.) After reviewing the settlement agreement, the Court finds no basis to disagree with the ALJ. The settlement agreement in the Block Island Lobster case simply contains too few details to serve as any kind of penalty benchmark and as such, is largely irrelevant. Based upon the record and the factors emphasized in the ALJ's decision, the Court finds substantial evidence justifies a mid-to-upper range penalty. Duckworth was not a greenhorn in the fishing industry and was not forthcoming in his dealing with the agents. Moreover, a meaningful civil penalty in this case will serve the ultimate goal of protecting the country's fisheries. See Roche, 249 F. Supp. 2d at 59 ("Protecting and restoring coastal fisheries is an important national goal, one likely to be undermined by imposing too-low assessments and thus encouraging some in the fishing industry [to violate the regulations] with impunity, figuring to account for fines as just another cost of doing business.").

14

V.   <u>Conclusion</u>

In light of the foregoing, Defendant's Motion for Summary Judgment is GRANTED and Duckworth's Motion for Summary Judgment is DENIED.


IT IS SO ORDERED.

_____

William E. Smith
United States District Judge
Date:   **3/22/06**

15